No. 23-2287

---

# In the United States Court of Appeals
## for the Fourth Circuit

ROBERT E. STAFFORD, JR., MELISSA BONETTI, HERBERT MALLET, JACQUELINE JOHNSON, CATHRINE ALLEN, DEVRON JONES, TABITHA DANIEL, LAQUASHA OSAGHEE and RONDA COLE, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees*,

v.

BOJANGLES' RESTAURANTS, INC.,

*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Western District of North Carolina

---

**BRIEF OF APPELLANT BOJANGLES' RESTAURANTS, INC.**

Charles E. Johnson
Douglas M. Jarrell
Brendan P. Biffany
Emma T. Kutteh
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
(704) 377-2536

*Counsel for Bojangles' Restaurants, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-2287        Caption: Stafford v. Bojangles' Restaurants, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Bojangles' Restaurants, Inc.
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Bojangles', Inc.; Walker Parent, Inc.; and Walker Intermediate Holdings, Inc.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Charles E. Johnson                     Date:   February 5, 2024

Counsel for: Bojangles' Restaurants, Inc.

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED ........................................................................ 2

INTRODUCTION ................................................................................ 3

STATEMENT OF THE CASE ............................................................ 6

    A.    Shift Managers Are the Lowest Level of
           Management in Bojangles' Restaurants ...................... 7

    B.    Bojangles Has a Lawful Policy that Shift
           Managers Be Paid for All Time Worked....................... 7

    C.    Plaintiffs Assert Varying, Individualized Claims
           of Uncompensated Time Worked ............................... 10

           1.    Plaintiffs' Written Discovery Responses
                  Show that Their Allegations of Off-the-
                  Clock Work Vary by Person ............................. 10

           2.    Both Parties' Experts Agree that Plaintiffs
                  Do Not Have Common Time Shaving
                  Claims—Most Have No Such Claim at All........ 13

           3.    Plaintiffs' Deposition Testimony Confirms
                  that Their Claims Are Dissimilar...................... 15

    D.    All Available Documentary Records Disprove
           Plaintiffs' Claims.......................................................20

    E.    Discovery Disproved Plaintiffs' "Labor Budget"
           and "Bonus Plan" Theories of Class Treatment........ 22

    F.    Plaintiffs Moved for Class Certification Based on
           New Theories............................................................... 27

# TABLE OF CONTENTS

**Page**

G. The District Court Certified North Carolina and South Carolina Classes Based on Flawed Commonality and Predominance Analyses ................ 28

SUMMARY OF ARGUMENT .................................................. 31

STANDARD OF REVIEW .................................................... 34

ARGUMENT ................................................................... 34

I. The District Court Abused Its Discretion in Holding that Plaintiffs Met Rule 23(a)'s Commonality Prerequisite Based on Bojangles' Opening Checklist ......... 34

A. The District Court Failed to Conduct a Rigorous Analysis of the Evidence, and Applied an Incorrect Standard of Review to Plaintiffs' Motion.... 37

B. The District Court's Commonality Decision Based on the Opening Checklist Misapplied *Wal-Mart*'s Definition of a "Common Question." ........................... 41

II. The Fact that All Putative Class Members Assert a Claim to Unpaid Wages Does Not Meet Rule 23(a)'s Commonality Prerequisite ..................................... 45

III. The District Court Abused Its Discretion by Failing to Conduct a Predominance Analysis ...................................... 52

A. The District Court Did Not Conduct a Predominance Analysis.................................... 52

B. Plaintiffs' Claims Fail to Meet Rule 23(b)(3)'s Predominance Requirement ....................................... 54

CONCLUSION .............................................................. 63

REQUEST FOR ORAL ARGUMENT .................................... 63

CERTIFICATE OF COMPLIANCE .................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Ollie's Bargain Outlet, Inc.*,
  37 F.4th 890 (3d Cir. 2022) ................................................................. 39

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................... 33, 53

*Anderson v. Sara Lee Corp.*,
  508 F.3d 181 (4th Cir. 2007) ............................................................ 61

*Babineau v. Fed. Exp. Corp.*,
  576 F.3d 1183 (11th Cir. 2009) ......................................................... 55

*Basco v. Wal-Mart Stores, Inc.*,
  216 F. Supp. 2d 592 (E.D. La. 2002) ................................................. 56

*Bass v. Dollar Tree Stores, Inc.*,
  No. 07-3108, 2008 WL 5273724 (N.D. Cal. Dec. 19, 2008) ................. 56

*Brayman v. KeyPoint Gov't Sols., Inc.*,
  83 F.4th 823  (10th Cir. 2023) ................................................ 44, 53, 62

*Brickey v. Dolgencorp., Inc.*,
  272 F.R.D. 344 (W.D.N.Y. 2011) ....................................................... 56

*Clausnitzer v. Fed. Exp. Corp.*,
  248 F.R.D. 647 (S.D. Fla. 2008) ........................................................ 56

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................ 34

*Davenport v. Charter Commc'ns, LLC*,
  302 F.R.D. 520 (E.D. Mo. 2014) ....................................................... 56

*Doyel v. McDonald's Corp.*,
  No. 4:08-cv-1198, 2010 WL 3199685 (E.D. Mo. Aug. 12, 2010) .... 56, 60

*Driver v. AppleIllinois, LLC,*
    265 F.R.D. 293 (N.D. Ill. 2010) ........................................................ 56

*Ealy v. Pinkerton Gov't Servs., Inc.,*
    514 F. App'x 299 (4th Cir. 2013) ........................................ 37, 45, 54

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) .............................................................. 51

*EQT Production Co. v. Adair,*
    764 F.3d 347 (4th Cir. 2014) ................................................ 35, 36, 44

*Ferreras v. Am. Airlines, Inc.,*
    946 F.3d 178 (3d Cir. 2019) .................................................. 38, 47, 48

*Gariety v. Grant Thornton, LLP,*
    368 F.3d 356 (4th Cir. 2004) ................................................ 33, 34, 53

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) ............................................................................ 36

*Hinojos v. Home Depot, Inc.,*
    No. 2:06-cv-108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) ................ 60

*Hinterberger v. Catholic Health Sys.,*
    299 F.R.D. 22 (W.D.N.Y. 2014) ......................................................... 48

*Humphrey v. Humphrey,*
    434 F.3d 243 (4th Cir. 2006) .............................................................. 45

*In re AutoZone, Inc. Wage and Hour Emp. Prac. Litig.,*
    789 F. App'x 9 (9th Cir. 2019) ........................................................... 55

*In re Bank of Am. Wage and Hour Emp. Litig.,*
    286 F.R.D. 572 (D. Kan. 2012) ................................................... 56, 59

*In re Marriott Int'l, Inc.,*
    78 F.4th 677 (4th Cir. 2023) ............................................................... 34

*Jahagirdar v. Computer Haus NC., Inc.,*
    No. 1:20-cv-33-MOC, 2021 WL 5163307
    (W.D.N.C. Nov. 5, 2021) .................................................................... 62

-iv-

*Koike v. Starbucks Corp.,*
    378 F. App'x 659 (9th Cir. 2010) ........................................................55

*Kos Pharms., Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004) ................................................................45

*Menocal v. GEO Grp., Inc.,*
    882 F.3d 905 (10th Cir. 2018) ...........................................................43

*Pryor v. Aerotek Scientific, LLC,*
    278 F.R.D. 516 (C.D. Cal. 2011) .........................................................56

*Pullman-Standard v. Swint,*
    456 U.S. 273 (1982) ............................................................................45

*Robinson v. Wal-Mart Stores, Inc.,*
    253 F.R.D. 396 (S.D. Miss. 2008) .......................................................56

*Romulus v. CVS Pharm., Inc.,*
    321 F.R.D. 464 (D. Mass. 2017) .........................................................48

*Ruiz v. Citibank, N.A.,*
    93 F. Supp. 3d 279 (S.D.N.Y. 2015) ...................................................48

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
    445 F.3d 311 (4th Cir. 2006). .....................................................34, 46

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ............................................................................53

*United States ex rel. Schnitzler v. Follette,*
    406 F.2d 319 (2d Cir. 1969) ................................................................37

*Vega v. T-Mobile USA, Inc.,*
    564 F.3d 1256 (11th Cir. 2009) ..........................................................52

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ....................................................................passim

*Washington v. Joe's Crab Shack,*
    271 F.R.D. 629 (N.D. Cal. 2010) ........................................................56

*Williams v. Martorello,*
  59 F.4th 68 (4th Cir. 2023)...................................................................61

*Windham v. Am. Brands, Inc.,*
  565 F.2d 59 (4th Cir. 1977) ...............................................................61

**Statutes**

28 U.S.C. § 1292(e) .................................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1367 .....................................................................................1

Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*......................1

**Rules**

Fed. R. Civ. P. 23............................................................................ passim

Fed. R. App. P. 34(a)(2) .......................................................................63

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because Plaintiffs assert a claim under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq*. The district court had supplemental jurisdiction over Plaintiffs' state-law wage claims under 28 U.S.C. § 1367.

Defendant Bojangles' Restaurants, Inc. ("Bojangles") timely filed a petition under Federal Rule of Civil Procedure 23(f) on November 3, 2023, which this Court granted. This Court has appellate jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

-1-

## ISSUES PRESENTED

1.      Did the district court err when it held that Bojangles' Opening Checklist created a common question of fact despite the absence of evidence that putative class members worked uncompensated time because of the Opening Checklist?

2.      Did the district court err when it held that the North Carolina and South Carolina classes could be certified based on the single common allegation that all putative class members were owed compensation for time worked?

3.      Did the district court err when it failed to conduct an analysis of whether the supposedly common questions it identified predominated over questions individual to each putative class member's claim?

## INTRODUCTION

In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the Supreme Court provided federal district courts with clear guidance in addressing motions for class certification. The Supreme Court explained what types of questions do and do not meet Federal Rule of Civil Procedure 23(a)(2)'s commonality prerequisite to class certification. It also admonished district courts to perform a "rigorous analysis" of the evidence presented on class certification, and cautioned district courts against applying a "mere pleading standard" to class certification motions. *Wal-Mart*, 564 U.S. at 350-51. Here the district court flouted *Wal-Mart*'s strictures when it granted Plaintiffs' motion for class certification.

Plaintiffs are current and former Bojangles shift managers who allege that Bojangles violated state wage-and-hour laws and the Fair Labor Standards Act by not paying shift managers for all the hours they worked. After years of discovery, Plaintiffs moved for class certification of their state-law claims. The evidence, however, shows that their claims are not appropriate for class treatment.

Plaintiffs' testimony establishes that they assert varying and contradictory claims to compensation that do not flow from any generally

applied policy that could meet Rule 23's commonality prerequisite. Rather, each Plaintiff's claim arises from his or her unique circumstances and the particular restaurant at which he or she worked.

The putative class members' allegations vary widely—some allege that they worked off the clock, but others deny doing so; some allege that their time was shaved, but others say they were paid for all the time they recorded; some blame their managers for requiring off-the-clock work, but others say their managers never told them to work off the clock. Resolving each shift manager's claim, therefore, would require an individualized inquiry into whether, when, why, and how that shift manager worked uncompensated time. The mini-trials necessary to resolve each class member's claim preclude class certification on predominance grounds.

It is no surprise that Plaintiffs attempted to obtain class certification based on a random assemblage of allegations of unpaid time worked from a small percentage of aggrieved former employees. This oft-tried strategy has been rejected hundreds of times by federal appellate and trial courts across the country. The district court ignored those precedents and the individualized nature of Plaintiffs' claims when it

granted Plaintiffs' motion to certify classes of North Carolina and South Carolina shift managers.

In certifying those classes, the district court failed to conduct the rigorous analysis of the evidence that *Wal-Mart* requires; rather, it applied the "mere pleading standard" that *Wal-Mart* prohibits. These failings led the district court to conclude incorrectly—based on an allegation unsupported by any evidence presented to the court—that Plaintiffs met Rule 23(a)'s commonality prerequisite. Compounding its errors on commonality, the district court failed entirely to analyze whether Plaintiffs met Rule 23(b)(3)'s predominance requirement, thereby refusing to consider whether the disparate and individualized claims of thousands of former employees render a class action unworkable here.

These failings constitute an abuse of the district court's discretion. To correct the district court's errors, this Court should reverse the district court's order and hold that Plaintiffs' claims cannot proceed on a class-wide basis.

## STATEMENT OF THE CASE

Former Bojangles shift manager Robert Stafford filed this class- and collective-action lawsuit alleging that Bojangles required its shift managers to work off the clock in violation of North Carolina and federal wage-and-hour laws. In November 2020, the district court conditionally certified a collective action of shift managers under the Fair Labor Standards Act. Approximately 550 current and former shift managers joined the collective action.

Eighteen months later, Stafford filed a second amended complaint in which he added 14 named plaintiffs and new claims under the wage- and-hour laws of South Carolina, Virginia, Tennessee, Alabama, Georgia, and Kentucky. Stafford also added a claim that Bojangles shaved time from shift managers' clocked in hours such that "[m]ost often, all overtime hours were systematically deleted." JA117 (2d Am. Compl. ¶ 45).

After two years of discovery—during which the parties took 45 depositions and exchanged nine expert reports—Plaintiffs moved for class certification of their state-law claims.

## A.    Shift Managers Are the Lowest Level of Management in Bojangles' Restaurants.

Bojangles owns and operates approximately 311 fast-food restaurants across eight states. JA205 (Bowers Decl. ¶ 3). Bojangles' restaurants have three tiers of in-restaurant management, of which shift managers are the third and lowest level. *Id.* Shift managers report to assistant general managers ("AGMs"), who in turn report to general managers ("GMs").[1] *Id.* On occasion, a shift manager may be the highest-level manager present in the restaurant, but a GM or AGM is typically present and is ultimately responsible for the restaurant's operations. JA205 (Bowers Decl. ¶ 5). Many shift managers are full-time employees, but a considerable number work substantially fewer than 40 hours per week. JA205 (Bowers Decl. ¶ 6).

## B.    Bojangles Has a Lawful Policy that Shift Managers Be Paid for All Time Worked.

Bojangles has a lawful policy that requires all restaurant crew employees, including shift managers, to be paid for all time worked. JA206 (Bowers Decl. ¶ 7); JA229 (Bowers Decl. Ex. 1). That policy is

---

[1] During part of the time relevant to this lawsuit, Bojangles referred to GMs as "unit directors" and AGMs as "assistant unit directors." JA205 (Bowers Decl. ¶ 3).

-7-

written in the Employee Handbook, which states "[a]ll crewmembers must 'clock' in and out to record the hours worked each day. . . . Accurate entries will ensure that you are paid correctly for all the time you work in a week." JA229 (Bowers Decl. Ex. 1). The Employee Handbook is also clear that shift managers "will be paid time and one-half their regular rate of pay for all overtime hours worked in a workweek." *Id.* Consistent with its written policy, between 2017 and 2021 Bojangles paid its shift managers more than $6.3 million in overtime wages for more than 339,000 hours of overtime. ECF No. 255-3 (Chase Decl. ¶ 17).

Bojangles' pay policy expressly prohibits working off the clock: "***No crewmember is permitted to work 'off the clock' at Bojangles'.***" JA229 (Bowers Decl. Ex. 1). To prevent unauthorized time edits, the Employee Handbook required that a manager's changes to a shift manager's time record "are to be signed by both you and your manager." *Id.*

Numerous plaintiffs testified that they understood Bojangles' pay policy prohibited off-the-clock work and time shaving. *See, e.g.*, JA512 (Oladini Dep. 68:12-14) ("Q. You understood that Bojangles had a policy that prohibited working off the clock, right? A. Yes."); JA296 (Bass Dep.

25:3-9) (same); JA274 (Allen Dep. 59:4-13) (same); JA479 (LaDuca Dep. 66:7-10) (same); JA393-94 (Goewey Dep. 40:20-41:8) (same). Plaintiffs who were promoted beyond shift manager testified that they adhered to the policy when supervising shift managers. Plaintiff Cheyennea Howze testified:

> Q. As a unit director, did you ever clock anyone in or out for a time that cost them time they were otherwise working?
> A. No.
> Q. Okay.
> A. I could lose my job for that.
> Q. You understood that Bojangles' policy prohibited that, right?
> A. Yes.

JA422 (Howze Dep. 50:9-17). Likewise, plaintiff Brett Manock testified:

> Q. Were you aware of anyone who worked off the clock as a shift manager while you were the assistant manager?
> A. To my knowledge, no. I'm not aware of anyone.
> Q. And when you were trained as an assistant manager, were you trained about Bojangles' clock-in and clock-out policies for hourly employees?
> A. I do recall, and we were trained, yes, that you clock in to work and you clock out when you leave.

JA504 (Manock Dep. 20:11-22); *see also* JA309 (Bonetti Dep. 52:3-9) (same); JA561 (Taylor Dep. 41:11-16) (same).

-9-

## C. Plaintiffs Assert Varying, Individualized Claims of Uncompensated Time Worked.

Plaintiffs' written discovery responses and deposition testimony show that Plaintiffs assert a morass of differing claims to compensation that vary both in the types of work allegedly performed without pay and the reasons that work supposedly went uncompensated.

### 1. Plaintiffs' Written Discovery Responses Show that Their Allegations of Off-the-Clock Work Vary by Person.

Bojangles served interrogatories on Plaintiffs, requesting that each of them (1) identify the activities they contend to have performed off the clock, and (2) state when they performed those activities. *See* JA625 (Goldberg Rep. ¶ 20). Plaintiffs responded to the first of those two requests using a table created by Plaintiffs' counsel. The table was pre-populated with various categories of activities that the responding plaintiff could claim to have performed, such as taking bank deposits, attending mandatory meetings, or completing post-shift cleaning work. *See id.* Some, but far from all, respondents gave estimates of the

uncompensated time they claimed to have spent performing each activity they identified. *Id*.[2]

Both Bojangles' expert Richard Goldberg and Plaintiffs' expert Brian Kriegler analyzed Plaintiffs' interrogatory responses. Goldberg concluded that the activities and the time estimates in Plaintiffs' responses "vary considerably across the activity categories." JA626 (Goldberg Rep. ¶ 21). For each category, "there were individuals who reported never having performed the activity." *Id*. And, of the individuals who provided time estimates, "some said they performed an activity for a few minutes on a few occasions while others claimed to have performed the activity routinely for many hours per week." *Id*.

Plaintiffs' allegations of pre-shift work illustrate these disparities. Nearly 20% of respondents said they never performed pre-shift work off the clock. JA627 (Goldberg Rep. ¶ 23). Of those who did claim to perform pre-shift work off the clock, many indicated that such work was uncommon—one respondent provided an estimate of "two times, 30

_____

[2] *None* of the 177 plaintiffs who provided responses after January 24, 2022 could estimate the amounts of time they spent performing the activities they identified, but *all* 224 plaintiffs who provided responses before that date did so. JA625 (Goldberg Rep. ¶ 20).

minutes," and another estimated "one time, one hour." *Id.* Yet others claimed that they performed pre-shift work off the clock for as many as 24 hours per week. *Id.* That variability, Goldberg concluded, "suggests highly individualized circumstances" "and is not indicative of a common company-wide policy" regarding pre-shift work. *Id.*

Plaintiffs' responses regarding post-shift work, mandatory meetings, bank deposits, and training activities showed similar variation. JA627-29 (Goldberg Rep. ¶¶ 24-27). For example, approximately half of the respondents reported never attending an off-the-clock mandatory meeting and more than 37% reported that they never traveled to make a bank deposit while off the clock. JA628 (Goldberg Rep. ¶¶ 25-26). The amounts of time plaintiffs claimed to have spent performing these categories of activities also varied greatly. *Id.*

Kriegler's analysis of the interrogatory responses also makes clear that Plaintiffs' claims stem from highly individualized circumstances. Kriegler's analysis, like Goldberg's, shows substantial variation in the activities Plaintiffs claimed to have performed without pay. *See* JA772 (Kriegler Rep. Ex. 5). Furthermore, Kriegler used certain plaintiffs' interrogatory responses to estimate the alleged unpaid wages owed to

each. JA827-32 (Kriegler Rep. Ex. 9). The resulting calculations demonstrate that Plaintiffs do not assert similar claims to compensation. For example, Kriegler estimated that plaintiff Keshon Bruce, who worked 29 shifts for Bojangles, is owed $153.00, while Jerica Castillo, who worked 30 shifts for Bojangles, is owed $1,585.44. *Id.* These two individuals are plainly making different claims to compensation.

In sum, the variations in Plaintiffs' interrogatory responses show there was "no 'average' or 'typical' experience among opt-in plaintiffs," but that experiences were highly individualized. JA626 (Goldberg Rep. ¶ 22).

> **2.  Both Parties' Experts Agree that Plaintiffs Do Not Have Common Time Shaving Claims—Most Have No Such Claim at All.**

Goldberg and Plaintiffs' expert Aaron Woolfson each analyzed data from Bojangles' timekeeping system to assess Plaintiffs' time shaving claims. Both analyses confirm that Plaintiffs do not have common time

shaving claims.[3] Goldberg concluded that Bojangles' adjustment activity was typical in the food-service industry and that the timekeeping data did not show that time was systemically edited. JA638-41 (Goldberg Rep. ¶¶ 50-56). In fact, adjustments to *increase* the time Plaintiffs worked were just as frequent as adjustments to reduce time. JA843 (Goldberg Rebuttal to Kriegler ¶ 14); JA692 (Goldberg Rebuttal to Woolfson ¶ 15).

Woolfson's analysis is consistent with Goldberg's. Of the more than 6 million shifts he studied, Woolfson concluded that ***less than 0.4% included a downward adjustment***. JA862-64 (Woolfson Rep. ¶ 42). Those downward adjustments affected only 1.1% of all paychecks, reduced overtime hours on only 0.3% of all paychecks, and eliminated overtime hours on only 0.2% of all paychecks. *Id.* Woolfson testified that many named plaintiffs had *no* downward adjustments and that adjustments actually caused some to be paid for more hours than they

---

[3] Plaintiffs falsely classify any edit to time as time shaving. *See* JA555 (Tate Dep. 36:2-25). In fact, employees often forget to clock in or out, and many plaintiffs testified that there were legitimate reasons for adjusting their time. *See, e.g.*, JA511-12 (Oladini Dep. 67:19-68:4) (stating that if she "forgot to clock out this night or something" she would "let them know so they can adjust it"); JA305 (Bonetti Dep. 44:1-18) ("Q. Employees sometimes forgot to clock in or forgot to clock out, right? A. Yes.").

had originally recorded. JA601-13 (Woolfson Dep. 84:24-96:25). Rather than show a common time shaving practice, the experts' analyses show that most plaintiffs could have no time shaving claim at all.

### 3. Plaintiffs' Deposition Testimony Confirms that Their Claims Are Dissimilar.

Plaintiffs' deposition testimony confirms that they assert dissimilar claims. For example, while some plaintiffs allege they performed pre-shift or post-shift tasks while off the clock, other plaintiffs testified in deposition that they did not do so. *See, e.g.*, JA406-07 (Griffin Dep. 46:21-47:6) (explaining that when he closed the restaurant he would "clock out, set the alarm, and then leave"); JA457 (Jones Dep. 36:19-25) (similar).

When deposed, plaintiffs also denied working off the clock to complete the multitude of other tasks that they alleged in their interrogatory responses went uncompensated. Hunter Bass, for example, testified that he did not recall ever performing post-shift tasks, traveling between stores, or completing extra cleaning while off the clock. JA292-95 (Bass Dep. 21:5-24:11). Likewise, Ebony Boykin disclaimed that she ever completed an errand, picked up or dropped off product from another restaurant, transported employees, or attended a manager meeting off the clock while working for Bojangles. JA312 (Boykin Dep. 22:11-25).

Devron Jones testified that he remained on the clock when picking up product from other restaurants and when making bank deposits. JA459, JA465-66 (Jones Dep. 38:1-7, 44:13-45:8); *see also* JA515 (Osaghae Dep. 29:21-25) (disclaiming taking deposits to the bank). Many plaintiffs testified that they completed their training while on the clock. *E.g.*, JA398-99 (Griffin Dep. 28:23-29:1) ("Q. And so you were clocked in for all the time you spent doing both the videos and the hands-on training, right? A. Correct."); JA387 (Goewey Dep. 15:20-22) (similar). Cathrine Allen denied ever working off the clock at all, saying she "[a]bsolutely" attempted to remain clocked in for all the time she spent working. JA274-75 (Allen Dep. 59:7-60:16).

Even among the plaintiffs who claim to have completed tasks while off the clock, their deposition testimony shows that the extent and circumstances surrounding that work varied markedly. Take, for example, testimony from three plaintiffs about taking deposits to the bank. One testified that she always took the bank deposit while off the clock at the direction of her supervisor. JA491-95 (Malone Dep. 22:1-26:23). Another testified that she was never instructed to take the deposit while off the clock. JA283-86, JA289 (Armstrong Dep. 42:3-45:7, 62:18-

20). And a third testified that he occasionally went to the bank while off the clock when he worked at one restaurant location, but always remained on the clock when he worked at a different location. JA402-04 (Griffin Dep. 38:23-40:13). Some plaintiffs admitted they may have been paid for the time they alleged in their interrogatory responses went uncompensated. JA447-49 (Johnson, J. Dep. 48:5-50:25); JA468-71 (Jones Dep. 54:15-57:10).

Other examples of deponents' varied experiences abound. *Compare, e.g.*, JA359-62 (Daniel Dep. 60:23-63:1) (testifying it was "nothing unusual" for her to pick up product while on the clock and that some of her off-the-clock product trips were later accounted for) *with* JA301-03 (Bonetti Dep. 38:8-40:24) (testifying her supervisor told her that her time would be adjusted to account for the time she spent picking up product from other restaurants) *and with* JA523-26 (Prentice Dep. 79:2-82:15) (testifying his supervisor always required him to pick up product while off the clock).

The reasons why plaintiffs supposedly worked off the clock are equally individualized. Some plaintiffs testified that they worked off the clock at the direction of their supervisors, but others testified that no

manager ever told them to work off the clock. *E.g.*, JA435 (Johnson, D. Dep. 38:3-5) ("Q. They never told you to clock out but then keep working? A. No."); JA366 (Eakes Dep. 39:13-15) (same); JA479 (LaDuca Dep. 66:4-10) (same).

Many testified that they made the independent decision to work off the clock and that they could have been paid for the time they now claim compensation for in this lawsuit. For example, Detanya Johnson testified she could have clocked back in for times she worked off the clock, but "it just didn't seem like a big deal" to her and that whether she worked off the clock "was decisions that was made on my end." JA434-36 (Johnson, D. Dep. 37:3-39:5). Another plaintiff testified that she made the decision to clock out and keep working based on her supervisor's "mood" earlier in the day. JA388, JA392 (Goewey Dep. 22:19-23, 26:8-10); *see also* JA533, JA536-44, JA549 (Stafford Dep. 89:17-21, 133:4-141:21, 154:7-16) (testifying he worked off the clock due to his subjective belief it was necessary to comply with Bojangles' labor guidelines).

Plaintiffs' time shaving claims are no more cohesive. Melissa Bonetti alleged her time was shaved because "other managers," "it didn't matter which manager," moved her hours over 40 in a given week to the

next week to avoid paying her overtime. JA306-08 (Bonetti Dep. 47:7-49:8). To Jerry Taylor, time shaving meant instances in which his supervisor forgot to adjust his hours after he forgot to clock in. JA563 (Taylor Dep. 70:5-18). Cheyennea Howze testified she had no idea whether her time records were manipulated. JA429 (Howze Dep. 103:2-17). Jacqueline Johnson's testimony exemplifies the majority of deponents' testimony on time shaving—they do not know how it happened, why, or who is to blame, and they have no proof, but they just *believe* they worked more than their paychecks indicated:

> Q. You believed it was Sheila who was causing your paycheck to not match the number of hours that you had recorded?
> A. I don't have proof that it was her. But it was the only manager at the time that was working with me and had access to it.
> Q. During the time that you were employed by Bojangles did you believe that Sheila was altering your time records?
> A. I can believe a lot of things. But proof -- I had to prove it, and I couldn't prove it other than it being not reflected on my check.

JA451-52 (Johnson, J. Dep. 58:16-59:2).

Plaintiffs' deposition testimony reveals that the only commonality among them may be that their written responses grossly overstated the nature and extent of their supposed unpaid time. *Compare, e.g.*, JA458-

-19-

59 (Jones Dep. 37:22-38:10) (named plaintiff Devron Jones testifying he took bank deposits two to three times per week and always did so on the clock) *with* JA912-13 (Jones Resp. to Interrog. 11) (Jones stating he took bank deposits off the clock four to five times per week for 30 to 40 minutes each time); *see also* JA276-78 (Allen Dep. 84:4-86:12) (named plaintiff Cathrine Allen recanting declaration statement that she was not permitted to clock in until 5:00 AM and blaming Plaintiffs' counsel for the misstatement).

## D.    All Available Documentary Records Disprove Plaintiffs' Claims.

The documents produced in discovery consistently disprove Plaintiffs' claims. For example, Plaintiffs alleged that CPI Security's alarm records were "the single most effective way to show Plaintiffs were working off the clock." ECF No. 251 at 15. Those records, however, discredit Plaintiffs' assertions of pre- and post-shift off-the-clock work. The median difference between the time an opening shift manager disarmed the alarm and the time he or she clocked in was *47 seconds*. JA634 (Goldberg Rep. ¶ 39). Likewise, the median difference between the time the shift manager clocked out at closing and the time anyone armed the alarm was *5.1 minutes*—a far cry from the difference that would have

resulted had the hours of off the clock closing activities alleged by many Plaintiffs actually occurred. JA636 (Goldberg Rep. ¶ 45).[4]

Plaintiffs also argued that backup tapes from Bojangles' timekeeping system would show that Bojangles shaved shift managers' time. ECF No. 251 at 9-12. As explained above, Plaintiffs' expert Aaron Woolfson analyzed those backup tapes, concluding that hundreds of plaintiffs had no paychecks affected by downward adjustments and that adjustment activity even caused some plaintiffs to have *greater* compensated time than they originally recorded. JA601-13 (Woolfson Dep. 84:24-96:25). Woolfson identified no downward adjustment activity for *more than 70% of plaintiffs*, belying any notion of a systematic time shaving practice. JA693 (Goldberg Rebuttal to Woolfson ¶ 16).

Bojangles' time and pay records disprove Plaintiffs' allegations that they were forbidden from reporting overtime hours and that those hours were systematically shaved off their paychecks. Bojangles' timekeeping records show that Plaintiffs recorded more than 40 hours in over 25% of

---

[4] This figure is an upper limit, but not a proxy, for time between clock-out and departure because it includes the frequent instances when a salaried manager stayed in the restaurant later than the closing shift manager. JA637 (Goldberg Rep. ¶ 46, n. 24).

-21-

the weeks they worked, and some Plaintiffs did so in more than 80% of weeks. JA630-31 (Goldberg Rep. ¶¶ 30-31). Some plaintiffs received more than *five hundred hours* of overtime pay during the period relevant to this lawsuit. JA631-32 (Goldberg Rep. ¶ 33). The payroll data confirms that, contrary to their allegations, Bojangles paid Plaintiffs for the overtime hours they recorded. JA631 (Goldberg Rep. ¶ 32). Plaintiffs produced no documents to counter Bojangles' contemporaneous records, which plainly disprove Plaintiffs' allegations.

### E.    Discovery Disproved Plaintiffs' "Labor Budget" and "Bonus Plan" Theories of Class Treatment.

In their amended complaint, Plaintiffs asserted that their differing claims to compensation could be litigated collectively because the claims were connected by a "labor budget" theory. *See* JA75 (Am. Compl. ¶¶ 36-38). Later, in the second amended complaint, Plaintiffs alleged that a "bonus plan" theory tied their claims together. *See* JA114-15 (2d Am. Compl. ¶ 41). Discovery disproved both of these theories of class treatment.

Between 2017 and October 2020, Bojangles used an Xpient timekeeping system and an internally developed spreadsheet called the Labor Management Tool (the "LMT" or the "labor matrix") for scheduling

and labor management. JA267 (Bradshaw Decl. ¶ 3). In October 2020, Bojangles began using HotSchedules, a third-party software program, for timekeeping, scheduling, and labor management. JA267-68 (Bradshaw Decl. ¶ 6). These systems, Plaintiffs alleged in their amended complaint, created "strict and unpliable labor budgets" that required shift managers to work off the clock "in order to balance the labor budget." JA75 (Am. Compl. ¶¶ 36-38). Plaintiffs made a similar allegation in their second amended complaint. *See* JA114-15 (2d Am. Compl. ¶ 41). (alleging that Bojangles "strictly enforc[es]" limits on compensable time that are "inadequate to meet the operational demands" of the restaurant). Plaintiffs have produced no evidence whatsoever to support these assertions, which are false.

Many plaintiffs testified that they were not familiar with either the LMT or the labor matrix. *See, e.g.*, JA484 (Mallet Dep. 84:10-14) ("Q. Did you ever hear the term Bojangles' labor matrix used while you worked there? A. No. Q. Did you ever hear the term LMT used? A. No."); JA459-60 (Jones Dep. 38:17-39:3) (same); JA288 (Armstrong Dep. 55:11-15) (same); JA332-33 (Carter Dep. 19:23-20:5) (same). Those who claimed they were familiar with the LMT had differing and often erroneous

understandings of its operation. *Compare* JA546-47 (Stafford Dep. 149:10-150:16) (believing the LMT was a dynamic program showing labor usage in real time) *with* JA370-71 (Fancher Dep. 64:12-24, 70:1-15) (believing it provided calculations to ensure each hourly employee worked fewer than 40 hours in a workweek). In reality, the LMT allocated weekly hours of labor to a restaurant based on predicted sales to aid the restaurant's GM in creating the restaurant's schedule, and it calculated a restaurant's weekly labor performance by comparing the hours actually used in the week to the hours the LMT projected. JA267 (Bradshaw Decl. ¶¶ 4-5).

Plaintiffs who correctly understood the LMT testified that there were three ways shift managers could help manage labor usage: (1) make sure employees took their breaks, (2) send employees home when sales were slow, and (3) tell incoming employees not to come in when sales were slow. JA326-29 (Butler Dep. 57:25-60:8); JA478 (LaDuca Dep. 65:20-22). Working off the clock was not a way shift managers were taught to help the restaurant manage its labor usage:

> Q. What do you remember being taught about labor at
> Bojangles?
> A. The regular stuff to teach people about labor when
> they're working. ***You can't work off the clock***. Make
> sure you clock in and you're clocking out.

JA515 (Osaghae Dep. 29:9-13) (emphasis added).

It is undisputed that the hours allocated by the LMT did not constitute a "cap" on the amount of labor a restaurant could use. An expert analysis of Bojangles' LMT spreadsheets confirmed that the actual weekly hours in Bojangles' restaurants exceeded the LMT's guideline more than 58% of the time. JA642 (Goldberg Rep. ¶ 60). In fact, in 48% of weeks, Bojangles' GMs *scheduled* employees to work more hours than the LMT guidelines advised. JA641-42 (Goldberg Rep. ¶ 58). In more than 25% of weeks, hours worked exceeded the LMT's guideline by at least 30 hours. JA642 (Goldberg Rep. ¶ 60)

These statistics are consistent with Plaintiffs' testimony. Named plaintiff Robert Stafford testified that his restaurant "blew labor like every single week" and that his "store was over one week I think it was a hundred hours in labor." JA530, JA545 (Stafford Dep. 82:8-11, 142:21). Another plaintiff testified that "it was almost weekly that we were over the amount of hours that were allowed." JA371 (Fancher Dep. 70:20-21).

Yet ***no plaintiff*** testified that he or she was ever disciplined for exceeding the LMT's guideline. *See* JA329 (Butler Dep. 60:6-8) ("Q. You were never disciplined for going over the labor matrix, were you? A. No.").

Many plaintiffs worked for Bojangles after October 2020, when the company moved to HotSchedules and changed the manner in which it calculated and communicated its labor guidelines. Shift managers have *no access* to HotSchedules' reporting tools relating to labor usage. JA268 (Bradshaw Decl. ¶ 9). No plaintiff has expressly alleged that Bojangles' use of HotSchedules resulted in any uncompensated time, and Plaintiffs have provided no way to disaggregate the claims of shift managers who worked in the LMT period and those who worked in the HotSchedules period.

In sum, discovery flatly disproved Plaintiffs' "labor budget" theory. Recognizing their theory had failed, in their second amended complaint Plaintiffs added a theory that Bojangles used a bonus program based on labor usage to induce GMs and AGMs to shave time and require shift managers to work off the clock. JA114-15 (2d Am. Compl. ¶ 41). Plaintiffs adduced no evidence to support that theory, either. The only evidence relating to Bojangles' bonus programs is that Bojangles takes into

consideration a multitude of factors relating to overall restaurant profitability when awarding bonuses to its restaurant managers, which is neither unlawful nor an uncommon practice. *See* JA598 (Fulk Dep. 53:7-15).

### F.    Plaintiffs Moved for Class Certification Based on New Theories.

After failing to adduce any evidence to support their labor budget or bonus plan theories, Plaintiffs moved for class certification on the new theory that Bojangles had an "unofficial policy" to require off-the-clock work and to shave time that manifested itself in innumerable individualized actions by thousands of shift managers and supervisors across Bojangles' more than 300 locations. ECF No. 386 at 15-18.

Plaintiffs did not cite any evidence—such as internal memoranda, directives to GMs or AGMs, or testimony from any corporate witness—to support the existence of the unofficial policy they alleged. No such evidence exists. Instead, Plaintiffs based their theory solely on unsupported speculation that an unofficial policy *must* exist because some shift managers asserted in declarations or interrogatory responses that they worked uncompensated time. *Id.* at 16.

In addition to their "unofficial policy" theory, Plaintiffs also argued that class certification was proper based on Bojangles' Opening Checklist, which Plaintiffs erroneously claimed required shift managers to work off the clock. *Id.* at 17-18.

Although they advanced these "unofficial policy" and "Opening Checklist" theories in their briefing, Plaintiffs also disclaimed any attempt to unify their claims other than the common allegation that Bojangles owes them money. According to Plaintiffs:

> The claims have always been that Bojangles did not pay Shift Managers for all hours worked because it worked them off the clock. The 'why' Bojangles did this is obvious – to make more profit. It really is not relevant how Bojangles got there – whether through labor budgets or bonus pay, or both, or neither.

ECF No. 397 at 4.

## G. The District Court Certified North Carolina and South Carolina Classes Based on Flawed Commonality and Predominance Analyses.

On October 20, 2023, the district court granted Plaintiffs' class certification motion in part and certified state-wide classes of North Carolina and South Carolina shift managers. JA4112 (Order). These two classes comprise more than 5,000 individuals and encompass more than 75% of Bojangles' shift managers.

-28-

In finding that the North Carolina and South Carolina classes met Rule 23(a)'s commonality prerequisite, the district court recited Plaintiffs' allegation "that they were required to complete certain tasks before clocking in pursuant to Bojangles' 'Opening Checklist.'" JA4106 (Order). Based on that allegation, the district court concluded that "the pre-shift work required by the Opening Checklist creates a common question of fact." *Id.* The district court did not explain how the Opening Checklist created a common question of fact, did not cite to any particular record evidence to support its conclusion, and did not cite any law to support its conclusion. *See id.*

After concluding that the Opening Checklist created a common question of fact, the district court decided that "*[a]ll* of Plaintiffs' claims are entitled to class treatment." JA4107 (Order) (emphasis added). Stated differently, although the district court found commonality based on the Opening Checklist, the district court certified not only Plaintiffs' claims for pre-opening off-the-clock work but also their claims for time shaving, post-shift work, taking bank deposits, transporting co-workers, and the many other activities Plaintiffs claim to have performed without pay. The district court determined that certification of all of Plaintiffs'

claims was proper because the class members' claims were "unified by a common theory of being worked off the clock." *Id.*

The district court also concluded that the North Carolina and South Carolina classes met Rule 23(b)(3)'s predominance requirement. The district court devoted just two sentences to predominance: "Despite differences in the character and extent of Plaintiffs' off-the-clock work, all class members' claims 'originate from the same alleged policies and practices,' including Bojangles' Opening Checklist. Consequently, the Court finds that the North and South Carolina Plaintiffs satisfy the predominance prong." JA4111 (Order).

The district court recognized that "dozens of federal appellate and district court decisions hold that off-the-clock and time shaving claims fail to meet the predominance requirement" but it declined to consider those cases for the sole reason that they were not decisions by or within the Fourth Circuit. JA4110 (Order). Instead, the district court relied exclusively on its own, unreported decision to conclude that Plaintiffs met the predominance requirement. *Id.*

## SUMMARY OF ARGUMENT

The district court abused its discretion when it granted Plaintiffs' motion to certify the North Carolina and South Carolina classes. The court did so in three key ways.

First, the district court erred when it concluded that Bojangles' Opening Checklist created a common question of fact sufficient to meet Rule 23(a)'s commonality prerequisite. In reaching that conclusion, the court relied exclusively on Plaintiffs' *allegation* that they worked off the clock to satisfy the Opening Checklist. No evidence presented to the district court supports that allegation. The district court thus failed to adhere to the Supreme Court's admonition that Rule 23 does not create a "mere pleading standard" and its requirement that the district court conduct a "rigorous analysis" of the evidence presented. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

Furthermore, the district court's finding that *all* of Plaintiffs' claims—whether for pre-opening off-the-clock work or otherwise—met the commonality prerequisite based on the Opening Checklist represents a fundamental misapplication of the commonality standard explicated by the Supreme Court in *Wal-Mart*. Had the district court applied the

correct standard, and conducted a rigorous analysis of the parties' evidence, it could only have concluded that questions surrounding the Opening Checklist do not satisfy Rule 23(a)'s commonality prerequisite.

Second, the district court erred in concluding that Plaintiffs met the commonality prerequisite merely because all putative class members assert a claim for unpaid wages against Bojangles. That conclusion contradicts *Wal-Mart*'s express statement that commonality "does not mean merely that [putative class members] have all suffered a violation of the same provision of law." 564 U.S. at 350. The district court's reasoning would also require certification of every case involving wage-and-hour claims—a result contradicted by hundreds of decisions denying certification of those claims. The evidence presented to the district court confirms that Plaintiffs assert varied claims to compensation that do not stem from any common, company-wide policy or practice and therefore cannot meet Rule 23(a)'s commonality prerequisite.

Finally, because Plaintiffs' claims lack any cohesion and fail to meet the commonality prerequisite, they necessarily cannot meet Rule 23(b)(3)'s predominance requirement. The district court erred when it concluded otherwise. More fundamentally, the district court's decision on

predominance constituted an abuse of discretion because the district court failed to conduct *any analysis* of whether Plaintiffs' claims met the predominance standard. In determining that Plaintiffs met the predominance requirement, the district court conflated predominance with commonality. That mistake contravenes this Court's clear guidance that the predominance requirement is "far more demanding" than commonality. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). The district court's conclusion is also at odds with the scores of decisions holding that claims like those Plaintiffs advance here fail to meet the predominance requirement. A proper predominance analysis leads only to the conclusion that Plaintiffs' claims cannot be certified for class treatment.

At bottom, Plaintiffs failed to offer any evidence that could connect the individualized claims they assert to any common, company policy or practice. Such individualized claims fail to meet Rule 23's commonality and predominance requirements. The district court abused its discretion when it held that Plaintiffs' claims are subject to class treatment. To correct the district court's abuse of its discretion, this Court should

reverse the district court's order and hold that Plaintiffs' claims cannot proceed on a class-wide basis.

## STANDARD OF REVIEW

Plaintiffs bear the burden of demonstrating that their putative class meets the Rule 23 requirements for certification. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004). A district court may certify a class only if, after a "rigorous analysis," it concludes that these requirements have been met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

This Court reviews a district court's class certification decision for abuse of discretion. *In re Marriott Int'l, Inc.*, 78 F.4th 677, 685 (4th Cir. 2023). "A district court per se abuses its discretion when it makes an error of law or clearly errs in its factual findings." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

## ARGUMENT

## I. The District Court Abused Its Discretion in Holding that Plaintiffs Met Rule 23(a)'s Commonality Prerequisite Based on Bojangles' Opening Checklist.

The district court first abused its discretion when it concluded—in a one-page discussion of commonality that cited to no wage-and-hour

cases and none of the thousands of pages of evidence the parties submitted with their briefing—that "the pre-shift work required by the Opening Checklist creates a common question of fact" sufficient to meet the commonality prerequisite for "[a]ll of Plaintiffs' claims." JA4106-07 (Order). To support its conclusion, the district court pointed only to a single assertion in Plaintiffs' class certification brief—that "Plaintiffs allege that they were required to complete certain tasks before clocking in pursuant to Bojangles' 'Opening Checklist.'" *Id.*

As a prerequisite to class certification, Federal Rule of Civil Procedure 23(a)(2) requires Plaintiffs to show that "there are questions of law or fact common to the class." To meet this prerequisite, the putative class members' claims must depend upon a common contention. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *EQT Production Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (same).

In other words, what matters to class certification "is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 351.

Plaintiffs seeking to establish commonality cannot rely on allegations that common questions exist. *See id.* at 350 ("Rule 23 does not set forth a mere pleading standard."). Rather, plaintiffs must present evidence to support the existence of a common question. *EQT Production Co.*, 764 F.3d at 357 (stating that a party seeking class certification "must present evidence that the putative class complies with Rule 23"); *Wal-Mart*, 564 U.S. at 350 (stating that a party must "prove that there are *in fact* . . . common questions of law or fact").

For its part, the district court must conduct a "rigorous analysis" of the evidence to determine whether Rule 23(a)'s commonality prerequisite has been met. *Wal-Mart*, 564 U.S. at 351 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). That analysis requires the court to "probe behind the pleadings" and may require "touching aspects of the

merits" of the plaintiffs' claims. *Id.* at 350-51. Failure to engage in a rigorous analysis of the evidence is an abuse of discretion. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305-06 (4th Cir. 2013).

The district court's commonality decision violated these principles in at least two ways, each of which stems from a fundamental failure to follow core principles of the Supreme Court's decision in *Wal-Mart*. Indeed, the district court's failure to adhere to *Wal-Mart*—which it erroneously declared three times during the hearing on the class certification motion to be "dead in the Fourth Circuit," JA4177-78 (Hearing Tr. 15:4-16:12)—is itself an abuse of discretion that warrants reversal. *See United States ex rel. Schnitzler v. Follette*, 406 F.2d 319, 322 (2d Cir. 1969) ("In this case, as in all others, the district court is required to follow a binding precedent of a superior court, and it abused its discretion in declining to do so.").

## A.    The District Court Failed to Conduct a Rigorous Analysis of the Evidence, and Applied an Incorrect Standard of Review to Plaintiffs' Motion.

In determining that Plaintiffs met the commonality prerequisite based on the Opening Checklist, the district court failed to follow the Supreme Court's admonitions that "Rule 23 does not set forth a mere

pleading standard," and that the district court must conduct a "rigorous analysis" of the evidence presented. *Wal-Mart*, 564 U.S. at 351.

To reach its conclusion, the district court relied entirely on assertions found only in the briefs submitted by Plaintiffs when it stated that "Plaintiffs *allege* that they were required to complete certain tasks before clocking in pursuant to Bojangles' 'Opening Checklist.'" JA4106 (Order) (emphasis added). The district court did not and could not point to any evidence offered by any party that supported Plaintiffs' allegation. Nor did the court provide any explanation to support its conclusion that the Opening Checklist created a common question of fact. The district court's blind reliance on Plaintiffs' allegations violated *Wal-Mart*'s requirement that the court rigorously analyze the evidence, and it improperly lowered the bar for class certification to that of a mere pleading standard. *See Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 184 (3d Cir. 2019) (reversing grant of class certification when district court "deviated from our precedent by employing a pleading and initial evidence standard" and noting that "Rule 23 does not set forth a mere pleading obligation" (citing *Wal-Mart*, 564 U.S. at 350)).

Had it conducted the rigorous analysis that *Wal-Mart* requires, the district court could not have concluded that the Opening Checklist creates a question of law or fact common to all putative class members' claims. Out of the approximately 30 deposition transcripts cited by the parties and dozens of repetitive declarations submitted by Plaintiffs to the district court, only ***one*** plaintiff mentioned any form of checklist as the cause of off-the-clock work. *See* JA1327 (Kintchen Decl. ¶ 4). The district court did not cite this singular reference to a "checklist" to support its conclusion. Even if it had, one individual's assertion that he worked off the clock to comply with a checklist does not support certifying a 5,000-person class on that basis. *See Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 902 (3d Cir. 2022) (holding that district court erred when it certified a nationwide class based on evidence limited to stores in a single state).

The absence of testimony that Plaintiffs worked off the clock to comply with the Opening Checklist is consistent with its plain language, which calls for shift managers to clock in before beginning their work tasks. The first three steps of the Opening Checklist are to (1) "Circle Lot for security; note anything out of place or unusual, park car by entrance

door"; (2) "Enter building together, relock doors and turn off alarm"; and (3) "Clock in and turn on necessary lights and equipment." JA253 (Bowers Decl. Ex. 2).

Plaintiffs argued that the first step—"not[ing] anything out of place"—requires them to work off the clock. ECF No. 386 at 2. In support, Plaintiffs pointed to testimony from a handful of declarants who say they cleaned the parking lot and exterior of the restaurant before clocking in. *Id. **None*** of those individuals, however, testified that they performed that work to comply with the Opening Checklist. Nor could they, because the Opening Checklist expressly states that work to clean the exterior of the restaurant—"Sidewalks by doors scrubbed and curbing swept, lot picked up", "Landscaping litter free", and "Trash taken out and dumpster area clean, dumpster doors closed"—is to be completed ***after*** clocking in. JA 253 (Bowers Decl. Ex. 2). Thus, any plaintiff who spent time off the clock performing those tasks did so ***in violation of*** Bojangles' policy.

If the district court had performed the rigorous analysis that *Wal-Mart* requires, it could only have concluded that no evidence supported Plaintiffs' allegation that they were required to work off the clock to comply with the Opening Checklist.

**B.    The District Court's Commonality Decision Based on the Opening Checklist Misapplied *Wal-Mart*'s Definition of a "Common Question."**

The district court's reliance on the Opening Checklist as the linchpin of commonality also demonstrates a fundamental misunderstanding of the Supreme Court's definition of commonality. In *Wal-Mart*, the Supreme Court defined a "common question" under Rule 23(a) as one for which the answer would "resolve an issue that is central to the validity of each one of the claims in one stroke." 564 U.S. at 350. Plaintiffs' own testimony, however, shows that working off the clock to satisfy the Opening Checklist is not an issue common to all shift managers.

Many shift managers testified that they never worked an opening shift—the only shift to which the Opening Checklist relates. *E.g.*, JA3700 (Taylor Dep. 43:3-5) ("Q. Mr. Taylor, when you worked as a shift manager, you never worked an opening shift, did you? A. I don't recall working an opening shift."); JA3713-14 (Walker Dep. 22:18-23:2) (same).

Those who did work opening shifts often testified that they did not perform pre-opening work off the clock. For example, named plaintiff Melissa Bonetti testified:

> Q. When you got to the restaurant for an opening shift to start the shift, first thing you would do when you got to the store was unlock the door and disarm the alarm, is that right?
> A. Yes.
> Q. And then would you go to the cash register to clock in?
> A. Yes.

JA3569 (Bonetti Dep. 26:12-19). Other shift managers' testimony mirrored Bonetti's. *See, e.g.* JA400 (Griffin Dep. 35:13-22) ("Q. And so the first thing you did when you arrived at work was unlock the restaurant, disarm the alarm, then clock in, right? A. Correct."); JA3679 (Malone Dep. 31:9-17) (same); JA3690-92 (Shelton Dep. 37:21-39:5) (same); JA3641 (Johnson, D. Dep. 30:15-20) (same). Indeed, many of the shift managers who responded to Bojangles' interrogatories stated that they **never once** performed pre-shift work off the clock, whether before opening shifts or otherwise. JA625-26 (Goldberg Rep. ¶ 20).

Plaintiffs also failed to present any evidence of the extent to which the Opening Checklist was disseminated across the company or followed at individual restaurants. Thus there is no evidence in the record to show which shift managers, if any, used the Opening Checklist or even knew it existed. Evidence showing shift managers' use of the Opening Checklist across Bojangles' restaurants in North Carolina and South Carolina is a

prerequisite to certification of classes of that breadth based on the Opening Checklist.

Because many shift managers never worked an opening shift, many shift managers disclaim performing pre-opening off-the-clock work, and Plaintiffs presented no evidence of the extent to which the Opening Checklist was followed at Bojangles' restaurants, the legality of the Opening Checklist cannot be a question common to the putative classes. *Wal-Mart*, 564 U.S. at 351; *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (stating that the question must be "common to the entire class"). The district court abused its discretion by concluding otherwise.

Finally, the district court abused its discretion when it used the Opening Checklist as the basis to find commonality as to ***all*** of Plaintiffs' claims. As described above, pre-opening off-the-clock work is just one of Plaintiffs' numerous claims for uncompensated time. The Opening Checklist has no bearing on Plaintiffs' claims that they performed other tasks—such as taking bank deposits, traveling to other restaurants, or closing the restaurant—while off the clock. It is also irrelevant to Plaintiffs' time-shaving claim. Plaintiffs have offered no evidence or explanation connecting the Opening Checklist to their other claims.

The district court's holding that the Opening Checklist sufficed to meet the commonality prerequisite for Plaintiffs' claims for time shaving and other off-the-clock work lacks any evidentiary or logical basis. *See Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 841 (10th Cir. 2023) (holding that district court abused its discretion when it failed to perform a "claim-specific analysis" and did not separately analyze plaintiffs' meal-break, rest-break, and off-the-clock claims). Because the Opening Checklist has no conceivable connection to Plaintiffs' other claims, it cannot support certification of those claims. *See EQT Production Co.*, 764 F.3d at 360 (stating that a common question is one that "will resolve an issue that is central to the validity of each one of the claims in one stroke" (quoting *Wal-Mart*, 564 U.S. at 350)).

In sum, the district court's holding that the Opening Checklist created common questions sufficient to certify all of Plaintiffs' claims disregarded *Wal-Mart*'s requirement that the district court conduct a rigorous analysis of the evidence, violated *Wal-Mart*'s admonition that Rule 23 does not set forth a mere pleading standard, and misapplied *Wal-Mart*'s definition of a common question. Each of these failings constitutes

an abuse of the district court's discretion. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305-06 (4th Cir. 2013).

Because a rigorous analysis of the evidence can lead only to the conclusion that questions surrounding the Opening Checklist do not satisfy the commonality standard laid out in *Wal-Mart*, this Court need not remand to the district court to conduct that analysis in the first instance. *See Humphrey v. Humphrey*, 434 F.3d 243, 248 (4th Cir. 2006) ("A court need not remand a case if 'the record permits only one resolution of the factual issue.'" (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982))); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 712 (3d Cir. 2004) (stating that when the district court applies an incorrect legal standard, the case need not be remanded "if application of the correct standard could support only one conclusion").

## II. The Fact that All Putative Class Members Assert a Claim to Unpaid Wages Does Not Meet Rule 23(a)'s Commonality Prerequisite.

In addition to erroneously accepting Plaintiffs' Opening Checklist theory as a basis for commonality, the district court also appeared to conclude that Plaintiffs met Rule 23(a)'s commonality prerequisite merely because all putative class members assert a claim for unpaid

wages against Bojangles. In its opinion, the district court wrote that the "class members are 'unified by a common theory of being worked off the clock,' regardless of the specific uncompensated activities they were required to perform." JA4107 (Order).

The district court's articulation of Plaintiffs' claims is merely another way of saying that Plaintiffs all assert a claim for unpaid time worked. But the view that commonality is satisfied when all putative class members assert the same claim (such as a claim to compensation for time worked) is directly contrary to *Wal-Mart*. The district court, therefore, abused its discretion when it held that Plaintiffs could proceed as a class based on their "common theory of being worked off the clock." *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006) (stating that a "district court per se abuses its discretion when it makes an error of law").

In *Wal-Mart* the Supreme Court expressed that commonality "does not mean merely that [putative class members] have all suffered a violation of the same provision of law." 564 U.S. at 350. This is so because the mere claim by employees of the same company that they suffered an injury "gives no cause to believe that all their claims can productively be

litigated at once." *Id.* Instead, to meet the commonality prerequisite, the putative class members' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Id.*

That each putative class member here claims to have worked off the clock is insufficient to support commonality under *Wal-Mart* because that contention alone gives no reason to believe that the class members' claims to compensation can be resolved on a collective basis. Thus the Third Circuit, in *Ferreras v. American Airlines, Inc.*, 946 F.3d 178 (3d Cir. 2009), directly rejected the argument that a common claim to off-the-clock work can suffice to meet the commonality prerequisite.

In *Ferreras*, hourly airport employees brought a class action under state law alleging that American Airlines failed to pay them for all hours worked. 946 F.3d at 181. The employees argued that their claims raised the common question whether they "are not being compensated for all hours worked." *Id.* at 182. The Third Circuit held that this question did not meet the commonality standard because resolving it "tells us nothing about actual common work habits, if there are any. The plaintiffs will still need to go through the process of proving that each individual employee worked overtime and is thus entitled to additional

compensation." *Id.* In other words, "Plaintiffs will have to offer individualized proof to show that they were actually working during the various time periods at issue, the main point of dispute in this case." *Id.* at 186. Because the employees failed to prove commonality, class certification was inappropriate. *Id.* at 187.

The "common theory" that all putative class members worked off the clock here is identical to the issue the Third Circuit rejected in *Ferreras*—whether the putative class members are owed money for time worked. If that question suffices to meet the commonality prerequisite, every wage and hour case would necessarily meet the commonality test. That cannot be. Indeed, the district court cited no case to support its conclusion that Plaintiffs' common claim to off-the-clock work could alone support a class action, and no case law supports such a conclusion. To the contrary, many district courts have found commonality lacking in cases like this one where putative classes assert generalized claims of off-the-clock work. *See, e.g.*, *Romulus v. CVS Pharm., Inc.*, 321 F.R.D. 464, 469-70 (D. Mass. 2017); *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 295 (S.D.N.Y. 2015); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 48-52 (W.D.N.Y. 2014).

The evidence submitted to the district court confirms that Plaintiffs lack the necessary glue binding their allegations of uncompensated time such that their claims could be resolved on a class basis. *See Wal-Mart*, 564 U.S. at 352 (holding that plaintiffs failed to prove commonality when they lacked "some glue holding the alleged *reasons* for [the challenged employment] decisions together").

Plaintiffs' evidence consists mostly of lawyer-written declarations reflecting anecdotally that Plaintiffs' time was shaved in different amounts, by different people, for different reasons, or that Plaintiffs worked off the clock at different times, in different places, in different ways, for different reasons, and to differing degrees. These individualized and varying anecdotes demonstrate that Plaintiffs' supposed off-the-clock work and time shaving did not result from a common, company-wide policy requiring off-the-clock work but, if at all, from individualized actions at dozens of Bojangles' restaurant locations.

Plaintiffs' deposition testimony likewise revealed that any alleged off-the-clock work or time shaving did not result from a company-wide policy or practice. Many plaintiffs testified they took it on themselves to work off the clock and that they could have been paid for that time if only

they had recorded it. *See, e.g.*, JA533, JA536-44, JA549 (Stafford Dep. 89:17-21, 133:4-141:21, 154:7-16); JA366 (Eakes Dep. 39:13-15). Indeed, one plaintiff went so far as to testify that the decision to work off the clock "was decisions that was made on my end" and that she could have clocked in for the time worked but "it just didn't seem like a big deal" to her. JA434-36 (Johnson, D. Dep. 37:3-39:5); *see also* JA388, JA392 (Goewey Dep. 22:19-23, 26:8-10) (testifying she made the decision to clock out and keep working based on her supervisor's "mood").

Many shift managers testified that no manager ever told them to work off the clock. *E.g.*, JA435 (Johnson, D. Dep. 38:3-5) ("Q. They never told you to clock out but then keep working? A. No."); JA479 (LaDuca Dep. 66:4-10) (same). Even among those who testified that their supervisors instructed them to work off the clock, testimony shows that the supposed instructions varied. One plaintiff testified that her manager required her to clock out when she hit 40 hours. JA316-17 (Brown Dep. 26:16-27:5). Another testified that his manager enforced a 50-hour cap. JA369 (Fancher Dep. 33:7-23). And a third testified that her manager would require her to clock out when "the labor was high." JA450 (Johnson, J. Dep. 53:3-5).

Plaintiffs similarly testified that they believed their time was shaved for a variety of reasons or no reason at all. For example, one plaintiff claimed that her time was shaved because "other managers" moved her hours to the next week to avoid paying her overtime. JA306-08 (Bonetti Dep. 47:7-49:8). Another believed that his time was shaved when his AGM forgot to adjust his hours after he forgot to clock in. JA563 (Taylor Dep. 70:5-18). And a third testified that she had no idea whether her time records were manipulated. JA429 (Howze Dep. 103:2-17).

Such plaintiff-by-plaintiff, manager-by-manager disparities show that Plaintiffs' claims do not arise from a single, uniformly applied policy or practice that could be resolved on a class-wide basis. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (stating that "[i]f there is no evidence that the entire class was subject to the same allegedly" unlawful practice, then "there is no question common to the class"). Rather, as in *Ferreras*, a resolution of each shift manager's claim would require the fact-finder to determine whether that shift manager actually failed to receive compensation for time worked on any given day.

For these reasons, the "common theory of being worked off-the-clock" raises no question that could "resolve an issue that is central to the

validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 351. The district court's decision to certify Plaintiffs' North Carolina and South Carolina classes based on that theory contravenes *Wal-Mart* and the weight of existing wage and hour case law, and it thus constituted an abuse of discretion.

## III. The District Court Abused Its Discretion by Failing to Conduct a Predominance Analysis.

### A.    The District Court Did Not Conduct a Predominance Analysis.

In addition to its faulty commonality analysis, the district court abused its discretion when it certified the North Carolina and South Carolina classes without conducting a predominance analysis. The court's failure "to consider the critical element of predominance" is "an obvious abuse of discretion and clear reversible error." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009).

To certify a class under Rule 23(b)(3), Plaintiffs must prove that questions "common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Supreme Court has held that this predominance requirement "calls upon courts to give careful scrutiny to the relation between common and individual

questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). In analyzing predominance, the district court must characterize "every issue related to the claim" as either "common or individual." *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023). The court must then "weigh the issues to determine whether the common issues predominate." *Id.*

A proper predominance analysis thus requires the district court to identify the questions relevant to the class members' claims, categorize those questions as either common or individual, and then weigh the two sets of questions to see which predominates. *Id.* In conducting the analysis, the district court must be mindful that the "Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

Here the district court did not weigh common questions against individualized ones to determine which set predominated. The district court's discussion of predominance consisted of only two sentences: "Despite differences in the character and extent of Plaintiffs' off-the-clock

work, all class members' claims 'originate from the same alleged policies and practices,' including Bojangles' Opening Checklist. Consequently, the Court finds that the North and South Carolina Plaintiffs satisfy the predominance prong." JA4111 (Order).

In its discussion, the district court conflated predominance with commonality. Even if the district court had been correct in stating that Plaintiffs' claims originated from the same policies and practices, those policies and practices would create just one common question to place on the predominance scale. The district court impermissibly failed to weigh whether individualized questions relevant to Plaintiffs' claims outweighed the single "common" issue the district court identified. *See Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 306 (4th Cir. 2013). (reversing district court's class certification decision when it "appeared to blend the commonality and predominance inquiries—which *Wal-Mart* counsels against").

## B. Plaintiffs' Claims Fail to Meet Rule 23(b)(3)'s Predominance Requirement.

Had the district court conducted a predominance analysis, it could have only concluded that individualized issues relating to Plaintiffs' claims predominate over common ones.

-54-

Dozens of federal appellate and district court decisions have held that off-the-clock and time shaving claims fail to meet the predominance requirement because, regardless of any employer policy, resolving the claims requires that the court consider each class member individually to determine whether, how, and when he or she worked off the clock or was subjected to time shaving. *E.g.*, *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1191-94 (11th Cir. 2009) (affirming denial of class certification of off-the-clock claims because question of existence of employer policy did not predominate over individualized issues of whether employees actually worked off the clock); *Koike v. Starbucks Corp.*, 378 F. App'x 659, 661 (9th Cir. 2010) (affirming denial of class certification on predominance grounds when "individualized factual determinations [were] required to determine whether class members did in fact engage in off-the-clock work"); *In re AutoZone, Inc. Wage and Hour Emp. Prac. Litig.*, 789 F. App'x 9, 12 (9th Cir. 2019) (affirming denial of class certification on predominance grounds when "a determination of why

some employees were under-compensated would have entailed an employee-by-employee analysis").[5]

This is so because "[o]nce the factfinder determines what [the defendant's] policies are, that does not answer the ultimate question in the case—whether [the defendant's] policies resulted in the under-compensation of . . . putative class members. This is not merely a question of damages, it is a question of liability." *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 532 (C.D. Cal. 2011).

---

[5] *Accord Davenport v. Charter Commc'ns, LLC*, 302 F.R.D. 520, 529-31 (E.D. Mo. 2014) (off-the-clock claims); *In re Bank of Am. Wage and Hour Emp. Litig.*, 286 F.R.D. 572, 588-91 (D. Kan. 2012) (off-the-clock claims); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 349 (W.D.N.Y. 2011) (off-the-clock and time shaving claims); *Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 532-36 (C.D. Cal. 2011) (off-the-clock claims); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629 642 (N.D. Cal. 2010) (off-the-clock and time shaving claims); *Driver v. AppleIllinois, LLC*, 265 F.R.D. 293, 314-16 (N.D. Ill. 2010) (off-the-clock and time shaving claims); *Robinson v. Wal-Mart Stores, Inc.*, 253 F.R.D. 396, 402 (S.D. Miss. 2008) (off-the-clock claims); *Clausnitzer v. Fed. Exp. Corp.*, 248 F.R.D. 647, 661-63 (S.D. Fla. 2008) (off-the-clock claims); *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002) (off-the-clock claims); *Doyel v. McDonald's Corp.*, No. 4:08-cv-1198, 2010 WL 3199685, at *3-7 (E.D. Mo. Aug. 12, 2010) (off-the-clock and time shaving claims); *Bass v. Dollar Tree Stores, Inc.*, No. 07-3108, 2008 WL 5273724, at *2 (N.D. Cal. Dec. 19, 2008) (time shaving claims).

Here numerous individualized inquiries would be necessary to resolve Plaintiffs' claims of off-the-clock work. The nature of Plaintiffs' supposed off-the-clock work varies by individual, as does the amount of uncompensated time and the frequency with which it supposedly occurred. *See* JA625-29 (Goldberg Rep. ¶¶ 20-27). For example, though some plaintiffs claim that they performed pre-shift or post-shift tasks while off the clock, other plaintiffs testified in deposition that they did not do so. *See, e.g.*, JA406-07 (Griffin Dep. 46:21-47:6) (explaining that when he closed the restaurant he would "clock out, set the alarm, and then leave"); JA457 (Jones Dep. 36:19-25) (similar).

Many Plaintiffs also denied working off the clock to complete tasks that different Plaintiffs alleged in their interrogatory responses were completed off the clock. *See* JA292-95 (Bass Dep. 21:5-24:11) (failing to recall ever completing post-shift tasks, traveling between stores, or cleaning while off the clock); JA312 (Boykin Dep. 22:11-25) (disclaiming that she ever completed an errand, picked up or dropped off product, transported employees, or attended a manager meeting off the clock); JA459, JA465-66 (Jones Dep. 38:1-7, 44:13-45:8) (testifying he remained on the clock while picking up product and making bank deposits); JA515

(Osaghae Dep. 29:21-25) (disclaiming taking deposits to the bank); JA398-99 (Griffin Dep. 28:23-29:1) (testifying he completed training while on the clock); JA387 (Goewey Dep. 15:20-22) (same). One named plaintiff, Cathrine Allen, denied ever working off the clock at all, saying she "[a]bsolutely" attempted to remain clocked in for all the time she spent working. JA274-75 (Allen Dep. 59:7-60:16).

Even among plaintiffs who claimed to have completed activities while off the clock, their deposition testimony shows that the extent of and circumstances surrounding that work varied markedly. *Compare, e.g.*, JA283-86, JA289 (Armstrong Dep. 42:3-45:7, 62:18-20) (testifying that she was never instructed to take the bank deposit while off the clock) *with* JA402-04 (Griffin Dep. 38:23-40:13) (testifying that he occasionally went to the bank while off the clock when he worked at one restaurant location, but always remained on the clock when he worked at a different location). Some plaintiffs admitted that they might have been paid for the time they claim in this lawsuit. JA447-49 (Johnson, J. Dep. 48:5-50:25); JA468-71 (Jones Dep. 54:15-57:10).

Plaintiffs' deposition testimony demonstrates why individualized determinations of fact—including what activities each plaintiff did on

each day, the amount of time he or she spent doing those activities, and whether he or she did them while on or off the clock—would be necessary to resolve each plaintiff's off-the-clock claims. *See In re Bank of Am. Wage and Hour Emp. Litig.*, 286 F.R.D. 572, 590 (D. Kan. 2012) ("Significant individualized assessments would be required to determine whether in fact the Bank is liable to each putative class member despite the alleged existence of an unofficial policy requiring off-the-clock work. Class treatment is simply not workable in this context."). The need for such individualized determinations becomes even more apparent when one considers that here no plaintiff attributed his or her off-the-clock work to a specific company-wide policy, directive, or practice.

Plaintiffs' time shaving claims, too, would require detailed individualized inquiry. Plaintiffs' expert confirms that only a fraction of plaintiffs even allege they were subjected to time shaving. JA772 (Kriegler Rep. Ex. 5). Those who do allege their time was shaved have not linked the allegation to a single company-wide practice. JA467 (Jones Dep. 49:19-21) ("Q. Do you believe there was a particular person or process who was manipulating your time records? A. No, sir. I have no clue who does that."). Determining whether any particular edit was

improper would therefore require individualized evidence "on a time punch-by-time punch basis." *Doyel v. McDonald's Corp.*, No. 4:08-cv-1198, 2010 WL 3199685, at *5 (E.D. Mo. Aug. 12, 2010).

Because the putative class members' claims require individualized inquiries into each plaintiff's factual situation, Bojangles will also be required to assert defenses on an individual level.

> For example, [Bojangles] would be entitled to contest whether any off-the clock work or improper time shaving occurred, to demonstrate that individual supervisors did not know about the off-the-clock work or time shaving, and to argue specific defenses available under the FLSA that may be applicable only to certain individual class members. With respect to alleged off-the-clock work, [Bojangles] might well offer evidence that particular supervisors acted in good faith, or that the off-the-clock activities did not constitute compensable "work," or that any alleged off-the-clock work or time shaving falls within the de minimis exception to the FLSA. With respect to the time shaving allegations, defendant would be entitled to show that any changes to time records were made for appropriate reasons such as legitimate errors made by employees or supervisors.

*Hinojos v. Home Depot, Inc.*, No. 2:06-cv-108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006). And because the state wage and hour laws at issue here are preempted by the FLSA to the extent Plaintiffs use them to seek overtime wages, the factfinder must also determine whether the alleged off-the-clock work of a given class member constituted straight time or

overtime. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 193-95 (4th Cir. 2007).

All of the individualized inquiries necessary to resolve the claims of each class member predominate over any common question to which Plaintiffs could point, making class certification unworkable and inappropriate here.[6] *See Williams v. Martorello*, 59 F.4th 68, 92 (4th Cir. 2023) (noting that if class members "attempt to rely on individualized evidence to establish [the defendant's] liability, he may move to decertify or modify the class on the basis that the predominance requirement should be reevaluated"). The number and extent of such individualized inquiries have led the "vast majority of district courts" to deny certification for similar off-the-clock work and time shaving claims. *Bank of Am.*, 286 F.R.D. at 590.

The district court recognized the vast number of cases supporting that Plaintiffs' claims do not meet the predominance requirement, but it

---

[6] These individualized inquiries also prevent Plaintiffs from proving Rule 23(b)(3)'s requirement that a class action be superior to other available methods of adjudication. *See Windham v. Am. Brands, Inc.*, 565 F.2d 59, 67 (4th Cir. 1977) (affirming denial of certification on superiority grounds when individualized issues would cause "an overwhelming deluge of mini-trials").

expressly declined to consider those cases for the sole reason that they were not decisions "by the Fourth Circuit, or even a district court therein." JA4110 (Order). Instead, the district court relied exclusively on its own, unreported decision in *Jahagirdar v. Computer Haus NC., Inc.*, No. 1:20-cv-33-MOC, 2021 WL 5163307 (W.D.N.C. Nov. 5, 2021), to conclude that Plaintiffs here met the predominance requirement. JA4111 (Order). Like its decision here, the district court's decision in *Computer Haus* contained no predominance analysis and is contrary to the great weight of wage and hour case law on predominance.

The district court's failure to conduct any analysis of whether individualized questions relating to Plaintiffs' claims predominate over common questions constitutes an abuse of discretion. *See Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838-41 (10th Cir. 2023). (reversing grant of class certification because district court failed to conduct a rigorous predominance analysis). Had the district court conducted a predominance analysis, it could have only concluded that individualized questions predominate over any common questions relating to Plaintiffs' claims.

## CONCLUSION

The district court abused its discretion when it found that Plaintiffs met Rule 23's commonality and predominance requirements. That abuse of discretion led to the district court's erroneous decision to certify the North Carolina and South Carolina classes. To correct the district court's errors, this Court should reverse the district court's order and hold that Plaintiffs' claims cannot proceed on a class-wide basis.

## REQUEST FOR ORAL ARGUMENT

Bojangles requests oral argument because oral argument will be helpful to the Court. This case raises important issues regarding the application of the Rule 23 commonality and predominance requirements, and in particular the application of those requirements in wage and hour cases. This Court has not previously had an opportunity to address those issues. As a result, this case meets the criteria for oral argument. *See* Fed. R. App. P. 34(a)(2).

This 5th day of February, 2024.

Respectfully submitted,

/s/ Charles E. Johnson
Charles E. Johnson
cejohnson@robinsonbradshaw.com

Douglas M. Jarrell
djarrell@robinsonbradshaw.com

Brendan P. Biffany
bbiffany@robinsonbradshaw.com

Emma T. Kutteh
ekutteh@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536

*Counsel for Defendant-Appellant*
*Bojangles' Restaurants, Inc.*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>12,031</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, using <u>Microsoft Word 2016</u>, in <u>14-point Century Schoolbook</u> type.

This 5th day of February, 2024.

<u>/s/ Charles E. Johnson</u>
Charles E. Johnson
*Counsel for Defendant-Appellant*
*Bojangles' Restaurants, Inc.*

-65-